Flannery, J.
Plaintiffs, David, Thelma, and Leonora Mayo (hereinafter “the Mayos”) and Calvin and Sarah Smith (hereinafter “the Smiths”), bring this action against the defendants, Key Financial Services, Inc. (Key) and Advanced Financial Services, Inc. (Advanced), seeking rescission of their respective loan agreements pursuant to the Massachusetts Consumer Credit Disclosure Act, G.L.c. 140D §10 (MCCDA) (Count II), and restitution of alleged excessive points paid on the loans (Count III).[3] On Count II, the plaintiffs contend that Advanced understated the finance charges on their loan applications, and that the understatements amount to material nondisclo-sures under MCCDA, allowing the plaintiffs to rescind the agreements. As to Count III, the plaintiffs assert that the points they were charged on the loans were excessive in violation of G.L.c. 183, §63, and they seek restitution from the defendants of the allegedly excessive points.
Key and Advanced claim that any understatement of the respective finance charges is immaterial as a matter of law and further assert that Massachusetts law does not apply to this action. Key also claims that G.L.c. 183, §63, does not provide a private right of action, and alternatively, that as assignee of the plaintiffs’ loans, it did not receive any excessive points.
Key also argues that the statute of limitations has expired on all claims. The parties cross-move for summary judgment on Count II pursuant to Mass.R.Civ.P. 56 and the defendants move for summary judgment on Count III. For the following reasons, the plaintiffs’ motion for summary judgment is allowed on Count II and the defendants’ motion for summary judgment is denied.
BACKGROUND
On May 6, 1989, the Smiths and Advanced entered into a loan agreement in which Advanced loaned the Smiths $12,100. The Smiths executed a note in favor of Advanced and repayment was secured by a mortgage on the Smith residence, located in Hyde Park, Massachusetts. The Truth-In-Lending Disclosure form states the Smiths’ finance charge as $15,575.80.[4] The “Itemization of the Amount Financed” form for the Smith loan states that the Smiths were charged a $50 public official recording fee and were also charged $35 for title insurance. These charges were not included in the finance charge calculation.
*270 Recording the documents of the Smith loan at the Registry of Deeds cost Advanced $32. The $32 cost is broken down as follows:
1 four-page mortgage $20.00
1 one-page mortgage rider $1.00
1 one-page legal description $1.00
1 one-page assignment $10.00
Total: $32.00
(Advanced exhibit, Dennis Hardiman affidavit, 14; Plaintiffs’ exhibit D, Powers affidavit, ¶19).
Advanced, a Rhode Island corporation, assigned the agreement to Key, a New York corporation.
On May 8, 1989, the Mayos and Advanced entered into a loan agreement in the amount of $171,600. The Mayos executed a note secured by a mortgage on their home located in Dorcester, Massachusetts, in favor of Advanced. The Truth-In-Lending Disclosure form provided to the Mayos by Advanced states that the Mayos’ finance charge was $26,009.45. On the “Itemization of the Amount Financed in your Mortgage Loan” form, the Mayos were charged $50 as a public officials recording fee. The Mayos were also charged $515 for title insurance. The recording fees and title insurance charge were excluded from the calculation of the finance charge. Advanced assigned the agreement to Key.
The Mayos and Smiths executed the agreement at Advanced’s office, located in Rhode Island.
DISCUSSION
Summaiy judgment shall be granted where there are no genuine issues as to any material fact and where the moving party is entitled to judgment as a matter of law. Kourouvacilis v. General Motors Corp., 410 Mass. 706, 716 (1991); Cassesso v. Commissioner of Correction, 390 Mass. 419, 422 (1983); Mass.R.Civ.P. 56(c). The moving party bears the burden of affirmatively demonstrating the absence of a triable issue “and [further,] that the moving party is entitled to judgment as a matter of law.” Pederson v. Time, Inc., 404 Mass. 14, 16-17 (1989). Where both parties have moved for summaiy judgment and “in essence there is no real dispute as to the salient facts or if only a question of law is involved,” summary judgment shall be granted to the party entitled to judgment as a matter of law. Cassesso, supra.
General Laws c. 140D § 10(a) permits obligors who use their residence for security on a loan the right to rescind the transaction until midnight of the third business day following the consummation of the transaction. The three-day period allowing rescission is extended to four years if the lender failed to deliver material disclosures to the obligors. Id.
In the case at bar, the Mayos and Smiths contend that the finance charge disclosed to each of them by Advanced was understated and that failure to disclose an accurate finance charge amounts to a material nondisclosure, entitling them to rescind the agreement.[5] For plaintiffs to prevail and rescind the loan agreements, the finance charge must have been understated and the understatement must be material within the meaning of G.L.c. 140D, §10.
Count II — Rescission
I. Did Advanced understate the Smiths’ and Mayos’ respective finance charges? The Smith Transaction
As discussed above, the Smiths were charged a $50 recording fee and a $35 title insurance fee, which were not included in the finance charge. The Code of Massachusetts Regulations, c. 209, §32.04(c)(7), the promulgated regulations to G.L.c. 140D, allows the lender to exclude from the finance charge title insurance fees and recording fees if the fees are “bona fide and reasonable in amount.” In other words, if the amount charged for these fees is not reasonable or bona fide, the overcharge must be included in the finance charge.
a. Recording fees
General Laws c. 262, §38 dictates public official recording fees necessaiy to record documents affecting title to Massachusetts real estate. Under the statute, recording a four-page mortgage is $20 and $1 for each additional page. Id. For recording other papers, such as assignments or discharges, the fee is $10.
There is no dispute between the parties that recording the Smith transaction at the Registry of Deeds cost $32. (Hardiman’s afft, ¶4; Powers afft, ¶19.) Accordingly, the Smiths were overcharged at least $18 to record the transaction, and this amount should have been included in the finance charge since it is the amount in excess of the bona fide or reasonable amount of recording fees.
In addition, the $10 assignment recording fee should also have been included in the finance charge. 209 CMR 32.04(b)(6) states that a finance charge includes:
Charges imposed on a creditor by another person for purchasing or accepting a consumer’s obligation, if the consumer is required to pay the charges in cash, as an addition to the obligation, or as a deduction from the proceeds of the obligation.
This section of the Code of Massachusetts Regulations is the analog to 12 CFR §226.4(b)(6), which was promulgated under the federal Truth-in-Lending Act. The Massachusetts Truth-in-Lending Act is closely modeled on the federal Truth-in-Lending Act. Lynch v. Signal Finance Co. of Quincy, 367 Mass. 503, 505 (1975). Where a statute is drafted to parallel a federal statute, it should be construed in accordance with federal law. Vasys v. Metropolitan District Commission, 387 Mass. 51, 54 (1982).
The bankruptcy court has interpreted 12 CFR §226.4(b)(6) to mean that where a creditor separately imposes a charge on the customer to cover the cost of making an assignment, the charge is a finance charge which must be included in the finance charge calcu *271 lation. In re Brown, 106 B.R. 852, 858-59 (1989). The court, relying on the plain language and the official commentary to §226.4(b)(6), further stated that requiring the consumer to pay for the assignment may not be excluded from the finance charge even if disclosed. Id. at 859. Since the failure of the lender to include the cost of the assignment in the finance charge resulted in the finance charge being understated, the court determined this understatement to be a material nondisclosure, allowing the obligor to rescind the transaction. Id. at 863; see also Cheshire Mortgage Service, Inc. v. Montes, 223 Conn. 80, 100-01 (1992) (holding that failure to include cost of future assignment in finance charge amounts to a material nondisclosure giving the defendants the right to rescind under the federal Truth-in-Lending Act).
Since the Smiths were charged for the assignment of the transaction to Key, evidenced by Hardiman’s affidavit and the disclosure form, under 209 CMR 32.04(b)(6) this charge was either in addition to the obligation of the loan agreement or the amount was deducted from the loan proceeds. The $10 assignment cost which Advanced charged the Smiths should have been included in the total finance charge. As a result, Advanced understated the Smiths’ finance charge by $28.
b. Title insurance.
The Smiths were charged $35 for title insurance on a $12,100 loan. The Smiths contend that the defendants charged them $3 per $ 1,000 loaned to them and that in 1989 a reasonable and bona fide rate for title insurance was $1.25-$1.50 per $1,000. Accordingly, the Smiths contend that their title insurance should have cost $25 dollars, and the $10 overcharge should have been included in the finance charge because the amount was not bona fide or reasonable.
To support their argument, the Smiths offer affidavit evidence of three real estate attorneys who state that the reasonable rate for title insurance on Massachusetts property in 1989 was $1.25-$ 1.50 per thousand dollars loaned. (See plaintiffs’ exhibit D, Powers afft, ¶8; Marioles afft, 18(a); Campbell afft, ¶5.) To counter the Smiths’ evidence, Advanced offers Hardiman’s affidavit and a rate chart from the title insurer, which states that Advanced actually paid $50 for the Smiths’ title insurance. Hardiman states that $50 was the minimum amount the insurer would accept. (Hardiman afft, §5 and exhibit D attached— Title Insurance Company “Schedule of Title Insurance Premium Rates, Commonwealth of Massachusetts.”) Accordingly, there exists an issue of fact as to whether the Smiths were overcharged or undercharged for title insurance.[6] Although this fact remains in dispute, it is not necessary to decide this issue since the Smiths were overcharged for recording fees by $28 resulting in an understatement of the finance charge.
The Mayo transaction
The Mayos contend that to record the proper documents at tiie Registry of Deeds cost only $32 but they were charged $50, and that the title insurance only cost $215 but Advanced charged them $515.
a. The Recording fee
The Mayos offer Powers’s affidavit to demonstrate that the bona fide and reasonable costs of the recording fees that could be excluded from the finance charge amounted to $32. (Plaintiffs’ exhibit D, Powers afft, ¶19.) The $32 fee is comprised of the following:
4-page mortgage $20
1 one-page rider $1
1 one-page legal description $1
1 mortgage discharge $10
Total: $32
Advanced counters this evidence by offering Hardiman’s affidavit which states that the total recording fee cost $52. Hardiman breaks down the $52 figure as Powers does but also offers exhibits that demonstrate an additional one-page discharge, adding another $10, as well as a $10 cost to assign the agreement to Key, totalling $52. As discussed above, the $10 assignment fee should have been included in the finance charge bringing Advanced’s total cost to record down to $42. Accordingly, the Mayos were overcharged $8 which was not bona fide or reasonable. In regard to the recording fee, there is no dispute Advanced understated the Mayos’ finance charge by $8.
b. The Title insurance fees
In accordance with the Smiths, the Mayos contend that the reasonable and bona fide rate of title insurance in 1989 was $1.25-$1.50 per $1,000 loaned and under such rates, on a $171,600 loan, they should have been charged $215, not the $515 they were charged. The Mayos offer affidavit evidence that the cost of the title insurance should have been $215. (Powers afft.) Hardiman’s affidavit states that charging the Mayos $3 per $1000 borrowed was not unreasonable and that lenders who do business in several states (such as Advanced) frequently see title insurance rates much higher than $ 1.25-$ 1.50. (Hardiman afft, ¶10.) To buttress Hardiman’s opinion, rate cards for title insurance in Rhode Island from two major insurers are attached to his affidavit. Upon close examination of these exhibits Hardiman offers, the court finds that the rate the Mayos were charged was unreasonable and not bona fide.
The rate cards are very similar in regards to title insurance fees. (Hardiman afft, exhibit H.) Under either rate card, a $100,000 mortgage loan would cost $225 for insurance and $1.75 per $ 1,000 over the base amount of $100,000. Since the Mayos were loaned $171,600, the maximum fee the Mayos should have been charged that could be excluded from the finance charge would be $350.30 ($225 for the first $100,000 plus $125.30 for the $71,600 over the initial $100,000 *272 at a rate of $1.75 = $350.30). Hardiman’s assertion that a $2.50-$3 rate was reasonable is inaccurate because a $2.50 rate was only charged on loans between $0 and $50,000, and the rate decreased as the loan value increased. Since the Mayos borrowed $171,600 the rates cure substantially lower as is evidenced by the exhibits provided by Hardiman. Accordingly, applying the rates Hardiman offers to support his assertion of reasonableness, Advanced still understated the Mayos’ finance charge by $164.70 ($515-$350.30 = $164.70).[7]
In addition, to show that Advanced inflated the title insurance fee, the Mayos offer the insurance policy issued to them from American Title Insurance Company which states that the premium paid to the insurer for title insurance on the Mayos’ loan was $215. This fee is at the rate of $1.25 per $1,000 for $172,000 of the amount borrowed. Accordingly, the policy demonstrates that the bona fide and reasonable rate for title insurance for the Mayos’ loan in May 1989 was $215 and the $300 overcharge should have been included in the finance charge. Reviewing all the evidence presented on the Mayos’ title insurance fee, it is undisputed that Advanced understated the Mayos’ finance charge between $164.70 and $300.
II. Does the understatement of the respective finance charges extend the period of rescission from three days to four years?
The Mayos and Smiths contend that because their respective finance charges were understated, the rescission period extended from three days to four years.[8] The issue presented is whether the respective understated amounts in the finance charge amount to “material nondisclosures.” Footnote 48 to §32.23(a)(3) defines “material nondisclosures” as “the required disclosures of the annual percentage rate, the finance charge, the amount financed, the total payments, and the payment schedule. 209 CMR §32.23(a)(3) n. 48 (emphasis added). The Code of Federal Regulation, c. 12, §226.23(a)(3) n. 48 defines ’’material disclosure" for the federal Truth-in-Lending Act using exactly the same language as 209 CMR 32.23(a)(3) n. 48. Accordingly, this court looks to federal interpretation of 12 CFR §226.23(a)(3) n. 48 to determine whether the understated finance charges amount to material non-disclosures. See Vasys, supra.
In 1980, the federal Truth-in-Lending Act was amended. In re Brown, supra at 853. A material disclosure relates to information that would affect the credit shopper’s decision to use the credit, and materiality should be determined by an objective standard based upon what a reasonable consumer would find significant. Steele v. Ford Motor Credit Co., 783 F.2d 1016, 1019 (11th Cir. 1986). Since the amendment, the federal courts have generally held that where the finance charge is understated, the inaccuracy amounts to a material nondisclosure extending the period of rescission. See Smith v. Fidelity Consumer Discount Company, 898 F.2d 896, 899-905 (3d Cir. 1990) (holding that 12 CFR §226.23(a)(3) n. 48 means that failure to accurately disclose the finance charge is a material violation of the federal Truth-in-Lending Act, entitling the borrower to rescind the loan transaction); Steele, supra, at 1019-20 (any understatement of the finance charge is material because any understatement would be of some significance to the reasonable consumer since it represents the total cost of the loan to the borrower); In re Brown, supra, at 861-62 (understated finance charge amounts to a material nondisclosure extending the rescission period of the borrower); see also Bustamante v. First Federal S. & L. Ass’n, 619 F.2d 360, 364 (5th Cir. 1980), citing Harris v. Tower Loan of Mississippi, Inc., 609 F.2d 120, 122-23 (5th Cir. 1980) (understated finance charge is a material nondisclosure); Brodo v. Bankers Trust Co., 847 F.Supp. 353, 356 (1994) (failure to disclose proper finance charge or amount financed constitutes a material violation which entitles the borrower to rescind the loan).
Advanced and Key attempt to demonstrate that even if the finance charges were understated, the understatements do not amount to material nondis-closures. The defendants rely on Malfa v. Household Bank, F.S.B., 825 F.Supp. 1018 (S.D. Fla. 1993). In Malfa, the plaintiff asserted that the defendant had not made three material disclosures, entitling the plaintiff to extend the rescission period. Id. at 1020-22. The plaintiff argued that the defendant failed to disclose 1) the annual percentage rate and finance charge in a manner more conspicuous than the other terms within the agreement; 2) that certain charges amounting to a fee and tax had been improperly excluded from the finance charge; and 3) that pest control inspection fees should have been included in the finance charge.[9] Id. The court determined that the “more conspicuous rule” amounted to a technical violation and that the terms had been disclosed. Id. at 1021. The court also determined that the pest inspection fees were properly excluded from the finance charge. Id. at 1022.
In examining the fee and tax excluded from the finance charge, the Malfa court found that these charges were disclosed on a HUD-1 Settlement Statement where the federal Truth-in-Lending Act required the disclosure of these fees be on a Disclosure Statement. Id. at 1021. If these charges were itemized and disclosed on a Disclosure Statement, they could be excluded from the finance charge. Id. The court also determined that since the fees were not disclosed on the proper form, the charges should have been included in the finance charge. Id. However, the court also determined that disclosure of these charges on the wrong form amounted to a technical violation because they were still itemized and disclosed, and, in addition, the charges would have to be paid as a matter of law regardless of the lender chosen. Id. at 1021-22. In essence, the court noted that these charges do not *273 affect the consumer’s decision in choosing a lender. Id. The court relied on Steele, supra, in reaching its decision, distinguishing the fees in Malfa as ones prescribed by law. Id.
The case at bar is closer to the facts of Steele than Malfa. Like Steele, the amounts that Advanced and Key should have included in the finance charge calculations were not prescribed by law but were merely inflated fees which the defendants retained for themselves. Furthermore, the fee and tax in Malfa could be excluded from the finance charge if disclosed on the proper Disclosure Statement form. In Malfa, the defendant disclosed charges but on the wrong form. Here, the inflated fees had to be included in the finance charge even if disclosed elsewhere. Only bona fide and reasonable fees could be excluded from the finance charge. In addition, unlike Malfa, the inflated amounts charged to the Mayos and Smiths were not disclosed elsewhere and were required to be included in the finance charge. These inflated charges were not prescribed by law and the understatement of the finance charge would be of some significance to a reasonable consumer shopping for loans. The plaintiffs’ motion for summary judgment on Count II is allowed and the defendants’ motion for summary judgment on Count II is denied.
Count III — Restitution
General Laws c. 183, §63 states in relevant part that:
A mortgagee shall not charge . . . points ... or similar fees in a mortgage transaction involving a residential property located in the commonwealth . . . except to the extent such . . . points constitute reimbursement for reasonable originating or underwriting expenses, as determined by the commissioner, incurred by the mortgagee for the intended purpose of selling mortgage loans in the secondary mortgage market. . .
The plaintiffs allege that they were charged excessive points on their respective loan agreements in violation of G.L.c. 183, §63, entitling them to restitution. Key contends that the restitution claim is barred by the tort three-year statute of limitations. Key also argues that under G.L.c. 183, §63, there exists no private right of action, and even if a right of action does exist, Key, as assignee, did not collect any points from the Smiths and only collected one point from the Mayos.
Under G.L.c. 260, §2A, the statute of limitations for a tort action is three years. General Laws c. 183, §63, is designed to protect consumers from sharp practices of mortgage lenders. Thus the statute has characteristics that are common to consumer protection statutes. Claims arising under G.L.c. 183, §63 must adhere to the procedural requirements of G.L.c. 260, §5A. See Micera v. Neworld Bank, 412 Mass. 728, 732 (1992) (holding statute protecting consumer in mortgage loan transaction is a consumer protection statute). General Laws c. 260, §5A requires the consumers to bring an action within four years from the accrual of the action. The plaintiffs have brought this action within the four-year statute of limitations and the action is not barred.
Since G.L.c. 183, §63 does not expressly provide for a private right of action and there is no case law deciding this issue, Ludlow Education Association v. Ludlow, 31 Mass. 110 (1991), offers guidance. In Ludlow, the Court of Appeals held that:
where the applicable law evidences a special legislative concern for an identified interest of a group of which the plaintiff is a member, and not merely a concern for the public generally, a private cause of action will be implied if the injury suffered falls within the area of concern.
Id. at 120. Under the principle in Ludlow, the right under the statute may be asserted by any appropriate common law remedy that is available. Id. at 119.
General Laws c. 183, §63 evidences a special legislative concern for mortgagors dealing with lenders taking advantage of unequal bargaining power. The Smiths and Mayos assert that they have suffered the harm the statute seeks to prevent. The common law remedy that the plaintiffs have chosen is restitution. Under the principle discussed in Ludlow, I conclude that G.L.c. 183, §53 affords a private right of action.
Key’s contention that it did not receive any excessive points from the Smiths and Mayos remains in dispute. The Hardiman affidavit states that any prepaid points charged to the Smiths or Mayos were collected by Advanced and that Key only received one point on the Mayo loan. (Hardiman afft, ¶11.)
The plaintiffs counter Hardiman’s affidavit by offering evidence that shows Key’s desire to continue to collect points and that Advanced was merely acting as Key’s agent. To establish an agency relationship, the plaintiffs’ evidence demonstrates that Key controlled the loan closings and that Key provided the funds for the Smith and Mayo transactions. The documents further demonstrate that Key controlled and approved all phases of the loan transactions between the parties. (See plaintiffs’ opposition to cross-motions for summary judgment, ex. C, Key memorandum showing a desire to continue to collect points; ex. D, Key’s confirmation to Advanced approving Mayo and Smith loan.) The evidence the plaintiffs offer establishes that there exists a genuine issue of material fact as to whether Key collected any of the points in the Mayo and Smith transactions and whether Advanced acted as Key’s agent. If Advanced was acting as Key’s agent, Key would be vicariously responsible for the unlawful conduct of its agent. Kelley v. Rossi, 395 Mass. 659, 661 (1985). Accordingly, the defendants’ motion for summary judgment as to Count III is denied.
*274 Choice of Law
The defendants assert that Massachusetts law is inapplicable to this action since Key is a New York corporation and Advanced is a Rhode Island corporation, and the loans were signed in Rhode Island. The defendants argue that Rhode Island law applies to this action, and that the Massachusetts consumer protection statutes that the plaintiffs rely on are inapplicable. The defendants’ argument is without merit.
A choice-of-law analysis is necessary where the law of the forum does not coincide with the law of the sister state. Chas. T. Main, Inc. v. Fireman’s Fund Ins. Co., 406 Mass. 862, 863 (1990); see also Cosme v. Whitin Machine Works, Inc., 417 Mass. 643, 644 (1994) (applying Connecticut’s statute of repose to an action brought in Massachusetts would bar plaintiffs claim); Bushkin Associates, Inc. v. Raytheon Co., 393 Mass. 622 (1985) (choice-of-law analysis necessary where action would be barred by New York statute of frauds but not barred by Massachusetts statute).
Applying a choice-of-law analysis to the case at bar clearly shows that Massachusetts law applies. A choice-of-law question does not turn on where the contract was made. Id. at 630. In Massachusetts, the Supreme Judicial Court has adopted a functional choice-of-law approach by examining various choice-influencing factors. Id. at 631. The court determines which state has the most significant relationship to the transaction and the parties. In determining which law should apply, the court begins by examining the contacts which the relevant states have with the parties and occurrence in the case. Cosme, supra at 647.
Here, the mortgages that the plaintiffs signed state that the law governing the transaction is the jurisdiction where the properly is located, which is Massachusetts (Hardiman afft, ex. C, G-¶13). The plaintiffs are residents of Massachusetts and the subject property is located in Massachusetts. The soliciting for the loans occurred in Massachusetts. (See Complaint, ex. 1.) The injurious consequences of the material nondis-closures result in Massachusetts. The only contact of states other than Massachusetts is that the defendants are from New York and Rhode Island and the agreements were signed in Rhode Island.
In examining the relevant interests of Massachusetts and Rhode Island, it is obvious that Rhode Island has an interest in protecting against fraud in its state. Massachusetts shares this interest in its own state and enacted General Law c. 140D and G.L.c. 183, §63 to protect the Massachusetts consumer from fraud and to ensure mortgagees are held accountable for any unscrupulous conduct.
The justified expectations of the parties also favor applying Massachusetts law. As discussed above, the signed mortgages inform each party that the law of Massachusetts shall apply to transactions arising from the mortgage transaction. Accordingly, Massachusetts has a more significant relationship to the parties and the occurrence than does Rhode Island. Massachusetts law applies to this action.
ORDER
For the foregoing reasons, it is hereby ORDERED that the plaintiffs’ motion for summary judgment on Count II is ALLOWED and the defendants’ motion for summary judgment on Count II and Count III is DENIED. It is further DECLARED that the plaintiffs have validly rescinded their respective loan agreements with the defendants. The parties shall arrange a proper schedule for return of all consideration thus far exchanged. If the parties fail to agree upon an appropriate schedule for return of all the consideration, a motion may be brought to determine the schedule of repayment.
The plaintiffs are entitled to costs and reasonable attorneys fees pursuant to G.L.c. 140D, §32(3).

 The plaintiffs have chosen not to pursue their usury claim (Count I). The word “point” as used in real estate financing denotes a fee or charge equal to one percent of the principal amount of the loan which is collected by the lender. The point (or points) is paid in addition to the stated interest rate on the face of the loan. Black’s Law Dictionary 1156 (rev. 6th ed. 1990).

 The finance charge is the cost of consumer credit as a dollar amount. It includes any charge payable directly or indirectly by the consumer and imposed directly or indirectly by the creditor as an incident to or a condition of the extension of credit. It does not include any charge of a type payable in a comparable cash transaction. 209 CMR 32.04(A).

 The only issue before the court on Count II is whether an understatement of the finance charge amounts to a material nondisclosure. Since the parties did not argue or brief whether the plaintiffs followed the appropriate procedural steps to rescind, the court assumes these steps were followed. See plaintiffs’ exhibit B, rescission notices dated October 23, 1992.

 Even if the Smiths were undercharged for the title insurance, the undercharge cannot offset the overcharge on the recording fee because the $35 title insurance fee would be bona fide and the $28 overcharge on the recording fees is not bona fide and should have been included in the finance charge.

 Furthermore, the court also notes that Hardiman offers a premium rate chart from American Title Insurance Company for rates in the Commonwealth of Massachusetts in order to establish that the Smiths’ title insurance cost a minimum of $50. In an attempt to establish that $515 fee for title insurance charged to the Mayos was reasonable, Advanced offers rate charts from the state of Rhode Island. The use of different states’ insurance rate charts for different loans, where both loans involve property located in the Commonwealth, leads to a reasonable inference that Hardiman’s attempt to justify the insurance fees is inconsistent. This inference is buttressed by the plaintiffs’ affidavit evidence in which real estate attorney Marioles states that property located in Massachusetts is subject to Massachusetts insurance rates, not Rhode Island. (Marioles afft, ¶8.)

 The parties place much emphasis on whether an inaccuracy of the finance charge by $10 is the “bright line” for determining whether the understatement of the finance charge amounts to a material nondisclosure. Since both the *275 Mayos’ and Smiths’ finance charges were understated in excess of $10, the court does not need to decide whether an understatement of the finance charge less than $10 amounts to a material nondisclosure. Steele v. Ford Motor Credit Co., 783 F.2d 1016, 1018-19 n.3 (11th Cir. 1986).

 The court also examined whether the rescission notice contained sufficient information regarding the plaintiffs rights. Malfa, supra at 1022.